

# In the Missouri Court of Appeals
# Eastern District

### DIVISION FIVE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED110076 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| vs. | ) | |
| | ) | Honorable Brian H. May |
| KEVIN FIELDS, | ) | |
| | ) | |
| Appellant. | ) | FILED: July 25, 2023 |

## Introduction

Kevin Fields ("Fields") appeals his convictions following a jury trial for murder in the first degree, armed criminal action, robbery in the first degree, and domestic assault in the second degree of Tami Allen ("Victim"). Fields raises three points on appeal. Fields contends that the trial court abused its discretion in allowing lab reports, which were prepared by the State's experts and admitted into evidence, to be sent to the jury during its deliberations because the exhibits were testimonial in nature. Fields next argues the trial court erred in admitting Victim's statements to police after Fields assaulted her in a prior incident and statements related to an order of protection against Fields on the grounds that the evidence was inadmissible hearsay and denied Fields his right to confront and cross-examine all witnesses.

Because the lab reports were not testimonial for the purpose of allowing the jury to review them during its deliberations, we deny Point One. Because the State showed that Fields

intended to make Victim unavailable to testify against him in the pending domestic assault case, the evidence relating to Victim's protection order and police statement were properly admitted under the doctrine of forfeiture by wrongdoing, and we deny Points Two and Three. Accordingly, we affirm the trial court's judgment.

Factual and Procedural History

Viewed in the light most favorable to the verdict, the following evidence was adduced at trial:

On January 5, 2016, Victim called her stepfather ("Stepfather") and asked if he would "get [Fields] out" of her home because he was calling her names. When Fields heard Victim asking for Stepfather's help, he tried to snatch Victim's cell phone from her hands. Fields started hitting Victim after he failed to grab her phone. Before Stepfather could hang up the phone, Victim said "Dad, he's hitting me. He's hitting me." Shortly thereafter, Victim called 911 and stated that Fields just beat her up. Fields was outside the house during the 911 call, but went back inside and assaulted Victim again.

Following the January 5 assault, Victim stayed with Stepfather for three weeks and changed her locks to prevent Fields from using his key to access her home. Victim gave a written statement to the police describing the January 5 assault, which included the following:

> [Fields] began to call me a hoe and a b**** so I called [Stepfather]. When [Fields] heard me ask [Stepfather] to come over and talk to him, he immediately ran from the kitchen to the living room where I was and attempted to snatch the phone out of my hand; when he wasn't successful at that he began to punch me in my face repeatedly. I ran to my bedroom and as he walked out the front door he threw the t.v. on the floor and broke it. I stayed in my bedroom and called 911. Then [Fields] came back in the house[,] busted down the bedroom door and began to punch me in my face and body. Then as he was leaving[,] he said, "When I come back. I'm f***ing your a** up! On Me!"

On January 8, 2016, Victim obtained an order of protection against Fields. The petition for that protection order alleged that Fields caused or attempted to cause Victim physical harm

2

and that Fields placed or attempted to place Victim in apprehension of immediate physical harm. The petition also alleged that Fields had threatened to coerce, stalk, harass, sexually assault, and unlawfully imprison Victim, and followed her from place to place. Victim's statements in the petition mirrored her statements to police. Specifically, Victim stated in the petition that "Kevin [Fields] repeatedly punched me in my face several times. I ran to my room to call 911. And he came in by busting down the door and began to punch me in my face and arm (right arm). As he was leaving, he said, 'When I get back, I'm whooping your a** … on me!'" Victim further stated that "Kevin [Fields] has been physically and verbally abusing me. I am afraid of him because he has access to firearms. And I have children in my home." There is no indication in the record that Victim served Fields with the order of protection.

In the accompanying domestic violence court risk assessment form, Victim indicated that Fields called her names, criticized her, and had been possessive or inappropriately jealous. Victim also indicated that Fields made threats to scare and/or intimidate her, including threatening to harm himself or her; used physical violence against her, such as slapping, hitting, pushing, kicking, choking, biting, restraining; destroyed her property and personal belongings; used or threatened to use a weapon such as a gun, knife, or other object against her; and drove recklessly when she and her children were in the car. Victim wrote on the assessment form: "Kevin [Fields] repeatedly punched me in my face while my [seven-year-old] daughter was in the house. He also punched me several times in my face, head, and right arms within that same night."

Shortly before midnight on February 4, 2016, Torence Smith ("Smith") received text messages from Victim saying that someone was in her house and that she was afraid to talk. Later, officers discovered that Victim had texted someone or a group of people asking them to

3

call 911 and provided her address. Smith arrived five minutes after receiving the text messages and then he called 911 because he could hear a "commotion" inside the house. When police officers arrived, they found Victim in the living room lying on her back with her head partially jammed through the drywall baseboard. Victim had suffered multiple injuries. Victim was semiconscious, but she could not communicate with anyone. Victim had numerous traumatic injuries to her face and had penetrating wounds to her chest, neck, head, face, abdomen, arm, hand, back, thigh, and buttocks. When paramedics attempted to intubate Victim, she went into full cardiac arrest. Victim was pronounced dead after arriving at the hospital. An autopsy revealed that her cause of death was multiple stab wounds to her neck and chest, and the manner of death was homicide.

The next morning, police officers found a navy-blue skull cap and a wallet/cell phone holder in the backyard of a residence about three blocks from Victim's home. Both items had reddish-brown stains, later determined to be blood. The wallet/cell phone holder contained a card with Victim's name on it, along with Victim's cell phone. Police officers found a trail of blood on chain-link fences leading from Victim's residence to where the skull cap and wallet/cell phone holder had been recovered.

Police officers identified Fields as a suspect after learning that he was issued a citation with a return court date for the January 5 assault and that Victim had sought an order of protection against him. Additionally, police officers recovered from Victim's residence a bloodstained EBT card issued to Fields.

Fields's sister ("Sister") testified that she talked to Fields on the day Victim was murdered. Fields was upset because Victim "had pressed charges on him because of a recent

4

fight they had." Previously, Victim told Sister that she was going to end her relationship with Fields because she "didn't want to get beat up anymore."

During the time of the incident leading to the murder charges, Fields was living with his cousin, Lavonda Logan ("Logan"). Logan told police that on the night Victim was murdered, Fields was not home when she went to sleep around 10:00 p.m. or 10:30 p.m. When she woke up at 3:00 a.m. that morning, Fields was sleeping on a couch in the basement. At Logan's home, police found blood on a wall in her home near the bathroom.

Fields evaded police until February 18, 2016. Detectives Joseph Percich ("Det. Percich") and Justin Adams ("Det. Adams") helped apprehend Fields after he barricaded himself inside of a house. Fields eventually gave himself up.

On February 18, 2016, Officer Rebecca Gardiner ("Officer Gardiner") went to the residence in which Fields had barricaded himself and found a key and a key fob. Officer Gardiner met Det. Adams at a tow lot where Fields's car was being kept and used the key to unlock Fields's car. Officers tested the interior of the car for blood. The center console, center console armrest, the driver's seat, and the brake pedal all indicated the presence of blood.

The State charged Fields with murder in the first degree, armed criminal action, robbery in the first degree, and domestic assault in the second degree. The first three counts were alleged to have occurred on or about February 4, 2016, and the domestic-assault count was alleged to have occurred on or about January 5, 2016.

Prior to trial, the State moved to admit Victim's hearsay statements under the doctrine of forfeiture by wrongdoing. Over Fields's objection, the trial court granted the State's motion, noting the State showed by clear and convincing evidence that it would be able to demonstrate at trial that Fields intended to make Victim unavailable as a witness in the domestic-assault case,

5

which was pending at the time of her death. The trial court further ordered that the State would be permitted to offer evidence related to the following: statements made by Victim to her Stepfather during the January 5 phone call; the circumstances surrounding the January 5, assault; Victim's statements to police officers regarding the January 5 assault ("Victim's Police Statements"); Victim's statements contained in the ex parte order for protection and its associated domestic violence court risk assessment form ("Victim's Protection-Order Statements"); and other information related to the domestic-assault charge, including the issuance of a summons and a court date scheduled for March 2, 2016.

At trial, the State offered testimony from expert witnesses Kyra Groeblinghoff ("Groeblinghoff") and Jesse Quinlan-Freihoff ("Freihoff") (collectively the "Expert Witnesses") regarding the blood and DNA evidence collected during the police department's investigation. Groeblinghoff testified that Victim was the source of DNA samples collected from several locations, including Victim's home, a knife found in Victim's home, Fields's car door handle, Logan's home, and on the fences leading to the yard where Victim's cellphone and the skullcap were recovered. Groeblinghoff further testified that several samples contained a mixture of DNA from different sources and explained that while Fields was included as a possible source in some samples, many samples were inconclusive or completely excluded him. Freihoff testified that several brown or red stains on several pieces of evidence were positively identified as blood. Fields had objected to all testimony regarding DNA or blood analysis and to the admission into evidence of the lab reports (the "Lab Reports") prepared by the Expert Witnesses, which comprised the DNA and blood analysis reports. The trial court admitted the reports over Fields's objections. During its deliberations, the jury requested certain reports of blood and DNA analysis the Expert Witnesses had prepared. Fields objected to providing the jury with the Lab

Reports, arguing that the Lab Reports were testimonial in nature and thus improper to send to the jury. The trial court determined that the Lab Reports were not testimonial and allowed the reports to be reviewed by the jury. To avoid unnecessary length and repetition, further details about the contents of the Lab Reports will appear later in the opinion.

The jury found Fields guilty on all counts. Fields filed a motion for new trial alleging, among other claims, that the trial court erred in admitting the exhibits of Victim's hearsay statements under the forfeiture-by-wrongdoing doctrine and in permitting testimony about those exhibits. Fields further alleged that the Lab Reports were testimonial exhibits that should not have been given to the jury during deliberations. The trial court overruled the motion for new trial and sentenced Fields to life imprisonment without parole for murder in the first degree, two terms of life imprisonment for armed criminal action and robbery in the first degree, and one term of seven years for domestic assault in the second degree, with all counts ordered to run consecutively. This appeal follows.

## Points on Appeal

Fields raises three points on appeal. In his first point, Fields argues the trial court abused its discretion in sending the Lab Reports to the jury during deliberations. Fields maintains the Lab Reports were testimonial in nature, and by allowing the jury to have the physical reports during deliberation, the testimony of the Expert Witnesses was unduly bolstered and emphasized, and the jury was allowed to give such testimony undue weight. In his second and third points, Fields contends the trial court erred in allowing the State to introduce and elicit testimony regarding certain hearsay statements by Victim prior to her death because the evidence was inadmissible hearsay, denied Fields his rights under the Confrontation Clause, and was not admissible under the doctrine of forfeiture by wrongdoing.

## Discussion

**I.  Points Two and Three—Admission of Victim's Hearsay Statements**

    A.      Standard of Review

"Typically, this Court reviews evidentiary rulings for an abuse of discretion." State v. Smith, 636 S.W.3d 576, 579 (Mo. banc 2022) (citing State v. March, 216 S.W.3d 663, 664 (Mo. banc 2007)); State v. Hosier, 454 S.W.3d 883, 896 (Mo. banc 2015) (citing State v. Bell, 950 S.W.2d 482, 484 (Mo. banc 1997)).  "Whether a criminal defendant's rights were violated under the Confrontation Clause[,] however, is a question of law this Court reviews de novo." Smith, 636 S.W.3d at 579 (citing State v. Justus, 205 S.W.3d 872, 878 (Mo. banc 2006)).  Our review is for prejudice, not mere error, therefore we will reverse the trial court's decision only if the error was so prejudicial as to deprive the defendant of a fair trial.  State v. McLaughlin, 265 S.W.3d 257, 262 (Mo. banc 2008).

    B.      Analysis

Generally, the Confrontation Clause of the U.S. and Missouri Constitutions prohibit the admission of testimonial statements of a witness who did not appear at trial unless the witness was unavailable to testify and the defendant had a prior opportunity for cross-examination. Crawford v. Washington, 541 U.S. 36, 53–54 (2004); see Smith, 636 S.W.3d at 579 (citing U.S. Const. amend. VI; Mo. Const. art. I, section 18(a)).  For purposes of the Confrontation Clause, a statement is considered to be testimonial if it was given while there was no emergency in progress and was made for the purpose of establishing or proving past events potentially relevant to later criminal prosecution.  Davis v. Washington, 547 U.S. 813, 822, 829 (2006).

Here, prior to Fields's trial for Victim's murder, Victim gave statements to police officers and others that Fields abused and assaulted her.  Victim pursued an order of protection arising out of the January 5 domestic-assault incident, among other allegations of verbal and physical threats and abuse.  Because Victim's Police Statements and Victim's Protection-Order

8

Statements were relevant to Fields's criminal prosecution and Fields never had an opportunity to cross-examine her, the exhibits constituted testimonial hearsay. See Crawford, 541 U.S. at 53–54; Davis, 547 U.S. at 822, 829. Over Fields's objections, the trial court admitted Victim's hearsay statements under the forfeiture-by-wrongdoing doctrine. The forfeiture-by-wrongdoing doctrine provides that "if a witness is absent by [defendant's] own wrongful procurement, [the defendant] cannot complain if competent evidence is admitted to supply the place of that which he has kept away . . . [because] [t]he Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts." McLaughlin, 265 S.W.3d at 271 (first alteration in original) (internal quotation omitted). Fields argues that Victim's statements were not admissible under the forfeiture-by-wrongdoing doctrine.

The application of the forfeiture-by-wrongdoing doctrine is conditioned on the State "show[ing] that the defendant engaged in the wrongdoing ***with the intent to prevent the witness from testifying.***" McLaughlin, 265 S.W.3d at 272 (emphasis added) (citing Giles v. California, 554 U.S 353, 359–66 (2008)).[1] Giles specifically discussed the application of the forfeiture-by-wrongdoing doctrine to domestic violence cases in which defendants allegedly murdered the victims:

---

[1] The Missouri legislature has since codified the forfeiture-by-wrongdoing doctrine as follows:
    1. A statement made by a witness that is not otherwise admissible is admissible in evidence in a criminal proceeding as substantive evidence to prove the truth of the matter asserted if, after a hearing, the court finds, by a preponderance of the evidence, that:
        (1)    The defendant engaged in or acquiesced to wrongdoing with the purpose of causing the unavailability of the witness;
        (2)    The wrongdoing in which the defendant engaged or acquiesced has caused or substantially contributed to cause the unavailability of the witness;
        (3)    The state exercised due diligence to secure by subpoena or other means the attendance of the witness at the proceeding, or the witness is unavailable because the defendant caused or acquiesced in the death of the witness; and
        (4)    The witness fails to appear at the proceeding.
    2. In a jury trial, the hearing and finding to determine the admissibility of the statement shall be held and found outside the presence of the jury and before the case is submitted to the jury.
Section 491.016, RSMo (Cum. Supp. 2021).

> Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. **Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution—rendering her prior statements admissible under the forfeiture doctrine. Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify.**

Id. (quoting Giles, 554 U.S. at 377).

McLaughlin applied the forfeiture-by-wrongdoing doctrine in a capital murder case in which the victim attempted to end her romantic relationship with the defendant before the defendant killed her. Id. at 260. McLaughlin affirmed the trial court's determination that the defendant's murder of the victim showed his intent to make the victim unavailable as a witness in the burglary and domestic-abuse cases against him and thus properly admitted testimonial hearsay statements into evidence. Id. at 271–272. Indeed, the defendant's intent to procure the victim's unavailability as a witness was supported by "ample evidence" in that:

> [Victim]'s statements prior to her death about defendant's stalking of her, threats to her, and abusive conduct were made during the time that she was attempting to break from the relationship and had filed for orders of protection and sought protection from the police so that she could safely go from work to home. The police were prosecuting [defendant] for burglary of her home less than a month prior to the murder, and during the succeeding month [defendant] was seen watching her home. The latest order of protection had been entered the very day of her death, November 20, 2003, and a hearing on the order of protection had been set for the very next day.

Id. at 273 n.10; see also Hosier, 454 S.W.3d at 897 (relying on Giles and McLaughlin to find that a murder-victim's statements found in an unfiled order-of-protection application were admissible under the forfeiture-by-wrongdoing doctrine because there was ample evidence that the defendant's actions were intended to cause the victim to be unavailable to testify in his burglary case). Giles, McLaughlin, and Hosier all support the trial court's evidentiary ruling in this case.

10

Here, the trial court conducted a hearing and determined that the State showed with clear and convincing evidence that Fields intended to procure Victim's unavailability to testify against him in the pending domestic-assault case. See McLaughlin, 265 S.W.3d at 271–72. Fields argues that the facts before us are significantly distinguishable from the facts in Giles, McLaughlin, and Hosier and suggests that we should be guided by this Court's ruling in State v. Buechting, 633 S.W.3d 367 (Mo. App. E.D. 2021). In Buechting, we held that "the record is simply devoid of the evidence found in McLaughlin and Hosier, that the crime was intended to prevent Victim from reporting abuse or crimes against her." Id. at 378. Rather, the evidence suggested the victim "was not yet ready to exit the abusive relationship, much less prepared to cooperate with authorities in prosecuting her abuser." Id. at 378 n.7. That scenario is simply not present here. The record shows that Victim clearly expressed her desire to end her relationship with Fields. Victim had begun cooperating with the police by reporting the January 5 domestic assault to law enforcement and in seeking an order of protection against Fields based upon that assault and other abusive conduct he committed against her. Fields suggests that Victim did not pursue the order of protection and argues that a dismissal of the order of protection weighs against applying the forfeiture-by-wrongdoing doctrine. Even assuming the cause for the order of protection was dismissed, the State convincingly argues that the record contains no evidence that Fields even knew that the order of protection was dismissed. In fact, the record does not show that Fields was served with the order. Regardless, Hosier is dispositive. See Hosier, 454 S.W.3d at 897. In that case, an unfiled application for an order of protection was found in Victim's purse when she was killed by the defendant. See id. The Missouri Supreme Court held that evidence supported the application of the forfeiture-by-wrongdoing doctrine, even though there was no active order of protection or pending charges for other offenses committed by the

11

defendant against the victim at the time she was killed.  See id.  The facts before us are even more compelling than in Hosier.  Here, the record indicates not only that Fields had a court appearance scheduled for his January 5 domestic-assault against Victim, but that Victim also initiated separate proceedings to obtain an order of protection against him.  Whether or not the proceedings to obtain a protective order may have been dismissed is not determinative of this appeal.  We hold that under the guidance of Hosier, the record before us demonstrates that the trial court did not err by admitting Victim's hearsay statements into evidence.  See id.

Fields additionally maintains that there is no evidence that he intended to prevent Victim from testifying against him.  Fields's assertion is plainly contravened by the record.  At the motion hearing and at trial, the State presented evidence that Fields attempted to prevent Victim from seeking help from Stepfather on January 5 by trying to knock her cell phone out of her hand.  Fields then broke down Victim's bedroom door and assaulted her after she called 911.  Victim then sought and obtained an order of protection, citing the January 5 assault, among other threats and instances of abuse.  Fields was issued a summons and notified of a pending court appearance relating to the January 5 assault at which Victim was expected to testify.  Importantly, ***on the day Victim was murdered***, Fields told Sister that he was angry with Victim because she "had pressed charges on him."  This evidence amply supports the trial court's finding that Fields intended to procure Victim's unavailability to testify against him.  See id. (quoting Giles, 554 U.S. at 377) (noting "[e]arlier abuse or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify.") (emphasis omitted); McLaughlin, 265 S.W.3d at 271.  Therefore, the trial court did not abuse its discretion in admitting Victim's hearsay statements under the forfeiture-by-wrongdoing

12

doctrine. See Hosier, 454 S.W.3d at 896 (citing Bell, 950 S.W.2d at 484). Points Two and Three are denied.

## II.    Point One—Allowing the Jury to Review Exhibits during Deliberations

### A.    Standard of Review

"The decision to send an exhibit to the jury room during deliberations lies within the sound discretion of the trial court." State v. Barnett, 980 S.W.2d 297, 308 (Mo. banc 1998) (internal citation omitted). "An abuse of discretion occurs only when the trial court's decision to exclude an exhibit from the jury room 'was clearly against reason and resulted in an injustice to the defendant.'" Id. (citing State v. Roberts, 948 S.W.2d 577, 596–97 (Mo. banc 1997)). "An objecting party has the burden of showing the prejudicial result of sending exhibits to the jury." State v. Smith, 90 S.W.3d 132, 142 (Mo. App. W.D. 2002) (quoting State v. Sullivan, 925 S.W.2d 483, 485 (Mo. App. E.D. 1996)).

### B.    Analysis

"The general rule is that exhibits that are testimonial in nature cannot be given to the jury during its deliberation." State v. Evans, 639 S.W.2d 792, 795 (Mo. banc 1982). "The reason often given for [this] rule is that testimonial exhibits tend to unduly emphasize some of the testimony, thus raising the possibility the jury would give it undue weight." State v. Reed, 21 S.W.3d 44, 46 (Mo. App. S.D. 2000) (citing Evans, 639 S.W.2d at 795). The test for determining whether exhibits are testimonial for purposes of providing them to the jury during deliberation is distinct from determining whether such evidence is testimonial relating to the Confrontation Clause. Rather, more narrowly, "[t]he rationale for this rule is simple: a deposition is introduced at trial in place of the live testimony of the same witness[;] [i]t is thus considered to be testimonial in nature and so, like a transcript of live testimony, is not given to the jury during deliberations." O'Neal v. Pipes Enters., Inc., 930 S.W.2d 416, 421 (Mo. App.

13

W.D. 1995) (citing State v. Brooks, 675 S.W.2d 53, 57 (Mo. App. S.D. 1984)) (noting the

rationale for excluding such testimonial evidence from jury deliberations applies equally in both

criminal and civil cases). Missouri courts are generally concerned with asymmetry, in that

> repetition of a portion of trial testimony [causes] that portion to be emphasized by reiteration, which in turn 'might lead to interminable confusion or to an unwarranted advantage to one party over the other,' and which further would invade a juror's duty to solely determine the facts according to his or her memory alone.

Id. (quoting Isreal v. Fanchon & Marco, 58 S.W.2d 774, 778 (Mo. App. K.C. 1933)).

Fields argues that the Lab Reports were testimonial for the purpose of submitting them to

the jury during its deliberations under State v. March, 216 S.W.3d 663 (Mo. banc 2007).

Fields's contention is misguided in the context of the present case because March applied the test

for testimonial evidence under the Confrontation Clause. See March, 216 S.W.3d at 667

(holding a laboratory report created for the purpose of prosecuting a criminal defendant may not

be admitted without the testimony of its preparer unless the witness is unavailable and there was

a prior opportunity to cross examine). The matter before us presents no Confrontation Clause

issue because the Expert Witnesses who prepared the Lab Reports testified at trial and were

subject to cross-examination. See id. Except for one conclusory statement, Fields does not

elaborate why March applies to the issue pending before us. We must determine whether the

Lab Reports are to be treated as testimonial for purposes of sending said reports to the jury

during deliberations. See Evans, 639 S.W.2d at 795.

No existing Missouri jurisprudence has considered whether lab-report exhibits are

testimonial for the purpose of allowing the jury to review them during deliberations. However,

Missouri courts have made clear that transcripts or audio/video recordings of depositions and

trial testimony are testimonial and thus barred from the jury room. See e.g., Brooks, 675 S.W.2d

at 57 (finding a written deposition was testimonial because it was read to the jury in lieu of live

14

testimony); O'Neal, 930 S.W.2d at 420–22 (finding the trial court prejudicially erred in allowing the jury to take into the jury room the videotaped testimony of a witness).

In contrast, an exhibit that summarizes an expert witness's findings has been found not to be testimonial for purposes of being provided to a deliberating jury. Hobbs v. Harken, 969 S.W.2d 318, 326–27 (Mo. App. W.D. 1998). In Hobbs, the Court distinguished the summary exhibit sought to be given to the jurors during deliberation from the videotaped deposition in O'Neal:

> Unlike [the summary exhibit here], the videotape at issue in O'Neal contained the actual testimony of a witness. [The appellant] cites us to no authority, nor do we find any, that an exhibit such as [the summary exhibit], *which simply sets out certain of the conclusions and calculations testified to by a witness*, should also be characterized as a testimonial exhibit. To the contrary, many exhibits contain opinions or facts also testified to by witnesses. Many such exhibits are used by witnesses during their testimony in order to help explain the witness'[s] testimony, or as a way of assisting the jury in understanding complicated issues or summarizing lengthy records. We agree with [the respondent] that such exhibits are not the type of testimonial exhibit which O'Neal said could not go to the jury room. *Because the exhibit at issue here did not constitute a prior trial transcript or deposition, but was rather simply a summary of calculations made by the witness, it was not a testimonial exhibit* and the trial court was not prohibited from sending it to the jury.

Id. at 326–27 (emphasis added) (citing O'Neal, 930 S.W.2d at 421–22). The relevant caselaw in Missouri has narrowly characterized "testimonial" evidence for purposes of jury deliberations as recorded testimony, whether written or video/audio recorded, such as the transcript of a deposition read at trial. See Brooks, 675 S.W.2d at 57. We find the reasoning in Hobbs instructive here, as Fields has also not cited to any Missouri caselaw indicating that the Lab Reports are the type of testimonial exhibit that Evans, Brooks, and O'Neal prohibit from being sent to the jury room.

We acknowledge that Fields provided caselaw from Georgia to support his contention that the Lab Reports are testimonial. See Harris v. State, 309 S.E.2d 431, 434 (Ga. App. 1983)

(finding the submission to the jury of a polygraph examiner's office report, *which was merely a written reiteration of the examiner's testimony* that the defendant was lying, was reversible error, in that such report had an unfair advantage over oral testimony by speaking to the jury more than once). Even if we were bound by Harris, which we are not, we find the case distinguishable because the polygraph examiner's report at issue was described as a word-for-word reiteration of the witness's live testimony. See id. In that regard, the expert report at issue in Harris is akin to the deposition testimony deemed "testimonial" by Missouri courts. We are unpersuaded that the Lab Reports rise to a prohibited level of testimonial repetition. Instead, the Lab Reports list and summarize the technical and scientific results from examining pieces of evidence tested for blood and DNA. For example, the Lab Reports stated the following regarding the sample taken from the mid-section of the knife handle in Victim's kitchen:

> A female DNA profile was detected. [Victim] is the source of this DNA profile.
>
> Male quantitation results from this item do not meet the Missouri Highway Patrol Laboratory's required threshold for Y-STR analysis. No additional testing will be performed at this time.

When asked to testify regarding that particular sample Groeblinghoff stated as follows:

> [STATE]: Did you analyze the swab of the red-brown stain on the midsection of the knife handle?
>
> [GROEBLINGHOFF]: Yes
> .
> [STATE]: And what -- what was your result?
>
> [GROEBLINGHOFF]: This result, a female DNA profile was detected. [Victim] is the source of this DNA profile.
>
> [STATE]: And what was the likely rarity?
>
> [GROEBLINGHOFF]: Again, it was rarer than 1 in 310 billion.
>
> [STATE]: Okay. All right . . . was male DNA detected or found . . . what was going on with that?

16

[GROEBLINGHOFF]: So earlier when I mentioned the quantitation steps, there are cases where we may detect male DNA at that step, but in the actual DNA profile, we don't detect male. So in this particular item, male quantitation results were obtained, but just not in the DNA profile.

[STATE]: Okay. So could that result from a wiping of the knife?

[GROEBLINGHOFF]: It's possible.

The Expert Witnesses testified about the contents of the Lab Reports and the processes implemented in creating them, and then opined as to the conclusiveness and accuracy of their analysis. It is clear from the record, however, that the Lab Reports are not a prepared summary of the Expert Witnesses's live testimony. Nor do the Lab Reports parrot the testimony of the Expert Witnesses so as to be deemed a strict reiteration of their live testimony. See Brooks, 675 S.W.2d at 57. Crucially, the Lab Reports did not provide the jury with a transcript or other recording of the Expert Witnesses's live testimony.

Because Missouri caselaw narrowly defines "testimonial" in the context of providing otherwise properly admitted exhibits to the jury during deliberation, we find that the Lab Reports were not testimonial evidence that the trial court was barred from sending to the jury during deliberations.[2] See Brooks, 675 S.W.2d at 57; O'Neal, 930 S.W.2d at 421; see also Hobbs, 969 S.W.2d at 326–27. Therefore, the trial court did not abuse its discretion in allowing the jury to review the Lab Reports during deliberation. See Barnett, 980 S.W.2d at 308 (citing Roberts, 948 S.W.2d at 596–97). Point One is denied.

---

[2] Our holding here should not be understood to encompass all "expert reports," as there are certainly conceivable situations where an expert's report would be properly admitted into evidence and also could be determined to be testimonial. We simply do not find that to be the case here.

17

## Conclusion

The judgment of the trial court is affirmed.

_____
KURT S. ODENWALD, Judge

Michael E. Gardner, P.J., concurs.
Renée Hardin-Tammons, J., concurs.