

# Missouri Court of Appeals

### Southern District

### Division One

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | |
| | ) | |
| vs. | ) | No. SD32888 |
| | ) | |
| DUSTIN J. SNOW, | ) | **Filed: July 31, 2014** |
| | ) | |
| Defendant-Appellant. | ) | |

APPEAL FROM THE CIRCUIT COURT OF JASPER COUNTY

Honorable David B. Mouton, Circuit Judge

**<u>AFFIRMED</u>**

A jury found Dustin J. Snow ("Defendant") guilty of abuse of a child; Defendant appeals claiming that (1) the evidence was insufficient to support the jury's verdict "in that the evidence did not prove beyond a reasonable doubt that [Defendant] knew his conduct was inflicting cruel and inhuman punishment," and (2) the trial court erred in admitting a Myspace message because no foundation was established for the message showing Defendant "sent the message, or that he alone had access to his [Myspace] account." We affirm the trial court's judgment.

1

Viewed in accordance with our standard of review for Defendant's points relied on, the evidence admitted at trial showed the following facts. The victim child's mother ("Mother") met Defendant "online" in "[e]arly May of 2010." At the time, Mother had two young children – a daughter who was two and a son who was about eleven months old. Defendant and Mother became romantically involved, and Defendant moved in with Mother in mid-July 2010 in Joplin.[1] On August 10, 2010, Mother "cooked breakfast," fed her son, and then left the children in Defendant's care in the kitchen while she showered in preparation for going to work. Mother's son began to cry for her when she left the kitchen because of his attachment to her. The only persons present in Mother's home at that time were Defendant, Mother, and her two children. On exiting the shower, Mother observed a knot on her son's left temple that "looked like . . . a golf ball," and that had not been present before her shower.

Mother immediately took her son to the emergency room at a hospital in Joplin where he was airlifted to a hospital in Kansas City. Tara Frazier, a board certified "child abuse pediatrician," testified as follows. On August 11, 2010, Dr. Frazier examined Mother's son at the hospital in Kansas City as part of a "child abuse team." Mother's son suffered bruising on both ears inside and outside the ear, a swollen and bruised left eye, and a swollen left temple. The swelling was sufficiently great that the son's left ear was "displaced." The bruising to both ears "show us that there were at least two episodes of trauma to the head." Dr. Frazier "came to a diagnosis of child physical abuse" meaning that:

---

[1] "[R]ight before [Defendant] moved in," Mother became pregnant and initially believed Defendant "was the father." Mother "share[d]" this information with Defendant. Mother "later learn[ed] that [Defendant] was not the father."

the injuries are not consistent with what we would see during routine play, nor are they consistent with what we would see from accidental injury. The pattern of injuries that he had, as well as the history or lack thereof of how he obtained those, in my expert opinion is significant of inflicted trauma or something that was done to him.

Dr. Frazier testified, "the injuries are consistent with blunt force trauma." Dr. Frazier also testified that, with respect to the possibility the son's injuries were caused by his sibling:

there's no history provided, other than the two year old pushing him on the sofa, of any type of contact or injuries from the two year old. And the majority of his head is not consistent with what I would expect from a two-year-old, as far as their coordination and strength goes.

Later on August 10, 2010, Detective Corporal Larry Swinehart with the Joplin Police Department interviewed Defendant. Defendant told Detective Swinehart (1) Mother's son was in Defendant's care while Mother showered, (2) Mother's son was "fussy" when Mother was not present with him, (3) the only persons present in the home when Mother's son was injured were Defendant, Mother, and Mother's two children, (4) Mother's son was injured when Defendant was outside the home for six to seven minutes smoking and sending texts on his phone, and (5) Defendant did not hurt Mother's son.

Mother terminated her relationship with Defendant on or shortly after August 10, 2010, although Mother and Defendant "texted off and on." Mother has a "Myspace page," and Mother has seen Defendant's "Myspace page" and Defendant "has . . . messaged [Mother] on Myspace." Over Defendant's objection that a Myspace message had not been authenticated as having been authored by Defendant, the trial court permitted Mother to identify Exhibit 18 as "a Myspace message that was sent from" Defendant's "Myspace account to [Mother's] Myspace account" on September 17, 2010. Mother printed the message and provided it to the prosecutor's office. Although Mother

3

was "not sure" she "had received messages from [Defendant] on Myspace before," she testified (1) she had visited Defendant's Myspace page "where he identified that this is his Myspace page," (2) Mother and Defendant had allowed each other access to their Myspace pages, (3) Defendant's Myspace page could not be found unless searched for in a specific way, (4) Mother recognized the September 17, 2010 message as being from Defendant's Myspace account by Defendant's name and photograph in the message, and (5) Defendant's photograph in the message was the photograph Mother "had seen on [Defendant's] Myspace account."

The trial court ultimately ruled on Defendant's objection stating: "Having reviewed the message contained in State'[s] Exhibit #18 and the entirety of that exhibit, and considering all of the circumstances the Court overrules the objection."[2]

The September 17 Myspace message read:

I hope this message finds you doing okay. I love you, as crazy as it might sound. I miss your dimples and that beautiful smile, the sparkle in your eyes when you looked at me. I long for death to sweep through and carry me away, for which I am too much of a coward to take it upon myself. The pain I brought onto you I am truly sorry. I would take it all back if I could. I hope the baby is being nice to you. How I long to be able to kiss your belly and watch it grow, feel the baby kick and roll. Tears comfort me, which let me know there is still somewhat of a heart in my chest that will never be filled with your love again. Hell is not sounding so bad, for which I am living it now. I wonder if it could be any worse. Someday I will find out. Someday soon I hope, even pray, for who or what I don't know. I love you and may you find better days and happier times.

Subsequently during Defendant's evidence, Defendant's "on-again, off-again" girlfriend and mother of a three-year-old child with Defendant testified that Defendant gave her the password to his Myspace account, and she wrote and sent the September 17 Myspace message to Mother. She did so because she "wanted [Defendant] to get in

---

[2] Defendant renewed this objection in his motion for judgment notwithstanding the verdict or new trial.

4

trouble, because he was being looked at and I was helping create suspicion." The girlfriend acknowledged that the Myspace message did not state "[Defendant] hit" Mother's son.

The jury found Defendant guilty of abuse of a child. The jury then assessed and declared Defendant's punishment at two years in the Department of Corrections. The trial court subsequently found the jury's assessment of punishment appropriate, and sentenced Defendant to two years in the Department of Corrections.

### Point I – Sufficiency of the Evidence

In his first point, Defendant asserts that the evidence was insufficient to sustain the jury's verdict "in that the evidence did not prove beyond a reasonable doubt that [Defendant] knew his conduct was inflicting cruel and inhuman punishment, as there was no evidence how the injuries came to be, and no evidence as to amount or means of force necessary to cause the injuries."

Our Supreme Court has described our standard of review as follows:

> In reviewing the sufficiency of evidence, this Court limits its determination to whether a reasonable juror could have found guilt beyond a reasonable doubt. *State v. Belton*, 153 S.W.3d 307, 309 (Mo. banc 2005). In so doing, the evidence and all reasonable inferences therefrom are viewed in the light most favorable to the verdict, disregarding any evidence and inferences contrary to the verdict. Id. As such, this Court will not weigh the evidence anew since "the fact-finder may believe all, some, or none of the testimony of a witness when considered with the facts, circumstances and other testimony in the case." *State v. Crawford*, 68 S.W.3d 406, 408 (Mo. banc 2002).

*State v. Freeman*, 269 S.W.3d 422, 425 (Mo. banc 2008).

As instructed by the trial court, one of the elements that the jury was required to find beyond a reasonable doubt to find Defendant guilty of abuse of a child was "that

defendant knew his conduct was inflicting cruel and inhuman punishment upon a child less than seventeen years old."

Under section 562.016.3:[3]

A person **"acts knowingly"**, [sic] or with knowledge,

(1) With respect to his conduct or to attendant circumstances when he is aware of the nature of his conduct or that those circumstances exist; or

(2) With respect to a result of his conduct when he is aware that his conduct is practically certain to cause that result.

Further, as we stated in *State v. Breedlove*, 348 S.W.3d 810, 815 (Mo. App. S.D. 2011):

"It is axiomatic that direct proof of a defendant's intent is rarely available." *[State v.]Still*, 216 S.W.3d [261,] 267 [(Mo. App. S.D. 2007)]. Thus, intent may be established by circumstantial evidence. *Id.* "The trier-of-fact also is permitted to infer a defendant's intent from the surrounding facts or from the act itself." *Id.*

Although the phrase "cruel and inhuman punishment" is not defined statutorily, "[t]hese terms have a settled common-law meaning and are words of general and common usage about which there is no great dispute as to meaning." *State v. Brown*, 660 S.W.2d 694, 698 (Mo. banc 1983). In addition, the plain and ordinary meaning of the word "punishment" in this phrase "includes 'severe, rough, or disastrous treatment.'" *State v. Silvey*, 980 S.W.2d 103, 108 (Mo. App. S.D. 1998). The phrase includes (1) slapping or hitting a child who was six on the face and neck with sufficient force to cause bruises that still were visible two days later, *State v. Sumowski*, 794 S.W.2d 643 (Mo. banc 1990), (2) spanking a two-year-old child multiple times in a short period by hand with sufficient force to cause bruises, *State v. Breedlove*, 348 S.W.3d 810 (Mo. App. S.D. 2011), and (3) choking a child that left visible signs of physical injury only briefly, *State v. Hines*, 377 S.W.3d 648 (Mo. App. S.D. 2012).

---

[3] All references to statutes are to RSMo 2000, unless otherwise specified.

In this case, Defendant told a law enforcement officer that (1) Mother's son was injured when Defendant was outside the home for a short time while Mother was in the shower and son was in Defendant's care, and (2) the only persons present in the home when Mother's son was injured were Defendant, Mother, and Mother's two children (her son who was about fourteen months old and her daughter who was two). On exiting the shower, Mother observed a knot on her son's left temple that "looked like . . . a golf ball," and that had not been present before her shower. Mother immediately took her son to the emergency room at a local hospital. Dr. Frazier testified that she "came to a diagnosis of child physical abuse" meaning that:

> the injuries are not consistent with what we would see during routine play, nor are they consistent with what we would see from accidental injury. The pattern of injuries that he had, as well as the history or lack thereof of how he obtained those, in my expert opinion is significant of inflicted trauma or something that was done to him.

Dr. Frazier further testified that "the injuries are consistent with blunt force trauma." Dr. Frazier also testified that, with respect to the possibility the son's injuries were caused by his sibling:

> there's no history provided, other than the two year old pushing him on the sofa, of any type of contact or injuries from the two year old. And the majority of his head is not consistent with what I would expect from a two-year-old, as far as their coordination and strength goes.

This evidence was sufficient to permit a reasonable juror to find beyond a reasonable doubt that Defendant caused the injuries to the son's head that resulted in the son being taken to the emergency room.

The evidence also showed that Mother's son was airlifted to a hospital in Kansas City, and testimony and photographs showed: Mother's son suffered bruising on both ears inside and outside the ear, a swollen and bruised left eye, and a swollen left temple.

7

The swelling was sufficiently great that the son's left ear was "displaced." Dr. Frazier testified that the bruising to both ears "show[s] us that there were at least two episodes of trauma to the head." That evidence combined with the evidence that showed Defendant caused the son's injuries is sufficient to permit a reasonable juror to find beyond a reasonable doubt that Defendant's acts were "cruel and inhuman punishment," and that Defendant acted knowingly.

Defendant's first point is denied.

## Point II – Foundation for Myspace Message

In his second point, Defendant contends the trial court erred in admitting a Myspace message received by Mother from Defendant's Myspace account because no foundation was established for the message showing Defendant "sent the message, or that he alone had access to his [Myspace] account."

We review a trial court's decision to admit evidence as follows:

> A trial court has broad discretion to admit or exclude evidence at trial. This standard of review compels the reversal of a trial court's ruling on the admission of evidence only if the court has clearly abused its discretion. That discretion is abused when a ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration. Additionally, on direct appeal, this Court reviews the trial court for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial. Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial.

*State v. Forrest*, 183 S.W.3d 218, 223-24 (Mo. banc 2006) (internal footnotes and quotations omitted). The defendant has the burden to show prejudice. *State v. Morgenroth*, 227 S.W.3d 517, 523 (Mo. App. S.D. 2007). However, in evaluating whether trial court error was prejudicial, we consider the whole record and do not view

8

the evidence in the light most favorable to the judgment. *State v. Foster*, 244 S.W.3d 800, 804 (Mo. App. S.D. 2008).

To be admissible, a writing, like the Myspace message in this appeal, "must be authenticated, i.e., the proponent thereof must show that it is, in fact, what it is claimed to be." *Saunders v. Bowersox*, 179 S.W.3d 288, 292 (Mo. App. S.D. 2005) (internal citations omitted).[4] Although the fact "a document purports to have been written and signed by the person to whom it is attributed, . . . standing alone, is insufficient to establish its authenticity and genuineness," *State v. Cravens*, 132 S.W.3d 919, 930 (Mo. App. S.D. 2004) (internal citation omitted), "[a]uthenticity of a writing may be proved by . . . circumstantial evidence." *State v. Durham*, 822 S.W.2d 453, 455 (Mo. App. E.D. 1991) (internal citation omitted). Finally, "[w]hether sufficient foundation has been laid to justify the admission of evidence is a matter for the trial court to determine in the exercise of its [] sound discretion." *State v. Cravens*, 132 S.W.3d at 929 (internal citation omitted). If there was evidence to support a trial court's exercise of discretion in finding that a writing had been authenticated sufficiently to justify admission of the writing, weaknesses in the evidence authenticating the writing should be for the jury to consider in determining the weight the jury accords the writing. *See State v. Malone*, 694 S.W.2d 723, 727 (Mo. banc 1985) (in the context of a witness' identification at trial of an unmarked bullet removed from a murder victim, the Court stated "[a]ny such weakness in identification was properly the subject of cross-examination, and was for the jury to consider in assessing the weight of the evidence."); *State v. Bowman*, 337 S.W.3d 679,

---

[4] Defendant has not referred us to any Missouri authority that specifically addresses the evidentiary foundation necessary for a "Myspace message," and we are not aware of any. However, we believe the evidentiary foundation for a communication through Myspace should follow the rules for writings in general.

9

689 (Mo. banc 2011) (similar statement in the context of two witnesses' visual identification at trial of a victim's underwear).

In this appeal, the Myspace message was relevant only if Defendant authored the message. Mother (1) testified she has a "Myspace page," and has seen Defendant's "Myspace page," (2) identified the message as "a Myspace message that was sent from" Defendant's "Myspace account to [Mother's] Myspace account" slightly more than one month after Mother's son was injured, and (3) printed the message and provided it to the prosecutor's office. Mother also testified (1) she had visited Defendant's Myspace page "where he identified that this is his Myspace page," (2) Mother and Defendant had allowed each other access to their Myspace pages, (3) Defendant's Myspace page could not be found unless searched for in a specific way, (4) Mother recognized the message as being from Defendant's Myspace account by Defendant's name and photograph in the message, and (5) Defendant's photograph in the message was the photograph Mother "had seen on [Defendant's] Myspace account." The body of the message also contains information about Mother's pregnancy and Defendant's relationship with and feelings for Mother that, at the time of the message when Mother was less than three months pregnant, were unlikely to have been known by many persons other than Defendant and Mother.

This evidence was sufficient to support a finding that Defendant authored the Myspace message. Weaknesses in the authentication evidence (including the testimony of Defendant's girlfriend that she wrote the message because she "wanted [Defendant] to get in trouble, because he was being looked at and I was helping create suspicion") were for the jury to consider in determining the weight the jury accorded the Myspace

message.  As a result, the admission of the Myspace message was not a clear abuse of the trial court's discretion because after, in the trial court's words, reviewing the "entirety" of the message and "considering all of the circumstances," a conclusion that Defendant authored the message was not clearly against the logic of the circumstances and so unreasonable as to indicate a lack of careful consideration.

Defendant's second point is denied.

The trial court's judgment is affirmed.


Nancy Steffen Rahmeyer, P.J. – Opinion Author

Daniel E. Scott, J. – Concurs

William W. Francis, Jr., C.J. – Concurs