

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | WD82597 |
| | ) | |
| JOSEPH MICHAEL WILSON, | ) | Opinion filed: June 23, 2020 |
| | ) | |
| Appellant. | ) | |

**APPEAL FROM THE CIRCUIT COURT OF CALLAWAY COUNTY, MISSOURI**
**THE HONORABLE J. HASBROUCK JACOBS, JUDGE**

Division Three: Anthony Rex Gabbert, Presiding Judge,
Edward R. Ardini, Jr., Judge and W. Douglas Thomson, Judge

Joseph Wilson ("Wilson") appeals his convictions for attempted robbery, domestic assault, property damage, and false imprisonment entered by the Circuit Court of Callaway County following a jury trial. We affirm Wilson's convictions but remand to the trial court for the limited purpose of correcting the written judgment to accurately reflect the jury's verdicts as to Counts I, II, IV, and XIV.

**Factual and Procedural Background**

Wilson and J.W.[1] began dating in 2010 and married in 2012. They lived with their three children in Fulton. Wilson and J.W. had problems throughout their marriage. By November 2016,

---

[1] We use initials to identify the victim to protect her identity pursuant to section 595.226.1, RSMo.

Statutory references are to the Missouri Revised Statutes 2010, updated through the 2015 supplement.

J.W. and Wilson had separated, but J.W. stayed with Wilson on occasion. On November 18, 2016, J.W. stayed the night with Wilson. The following morning, Wilson demanded J.W. give him her cell phone and leave. J.W. complied and left for work. After work, she returned to retrieve some personal items. Wilson met her by the door and asked why she was there. The two argued, and Wilson demanded J.W. give him her purse. J.W. refused, and Wilson grabbed the purse. J.W. did not let go, and she fell to the ground. Wilson dragged J.W. from the driveway to the house before eventually releasing the purse. J.W. suffered a bruise on her hand and scratch on her leg during this incident.

J.W. ran from the home, obtained a ride to Walmart to buy a new cell phone, and was then taken to her parents' residence. Wilson sent J.W. a text indicating that he would bring her personal items to her. However, upon arriving at the parents' home, Wilson threw J.W.'s clothes and other items into the street and then drove over them with his vehicle.

The next day, J.W. reported the previous day's incident to police. J.W. additionally disclosed other past incidents of abuse by Wilson.

J.W. discussed an argument that occurred on approximately October 8, 2016. During this altercation, Wilson would not allow J.W. to leave with her cell phone. A struggle ensued that resulted in J.W.'s neck being burned by her cigarette. The following day, arguments between Wilson and J.W. continued, and Wilson punched J.W. in the face. J.W. convinced Wilson to allow her to leave for an hour, and, during this period, she went to the home of a friend and the friend took photographs of J.W.'s bruises.

J.W. also told the officer about multiple assaults that had occurred between February and April 2016.[2] On one occasion, J.W. and Wilson had planned to take their children to the circus,

---

[2] J.W. could not remember specific dates for the events that occurred during this time period.

but Wilson fell asleep. When he awoke, Wilson was angry that J.W. did not take the children by herself, and he punched her in the cheek with a closed fist. On another occasion, Wilson was mad at J.W. for talking to police, so he choked her with his hands. Another time, after becoming angry with Wilson following a yard sale, Wilson attempted to punch J.W. in the face, but she moved and Wilson's fist hit her arm. Yet another time, J.W. asked to leave the house, and Wilson grabbed her by her hair and pulled her to the ground. On a different occasion, J.W. found Wilson and another woman in bed, and Wilson kicked J.W. in the stomach and called her a "c*ck block." As part of a final incident during this period, Wilson punched J.W. in the chin while they were in their kitchen.

J.W. additionally disclosed an event that occurred the day before Thanksgiving in 2015, when Wilson picked up a Coke can and smashed it in J.W. face. The impact knocked J.W. unconscious, caused her to see spots, and left a bruise on her temple and eye.

Finally, J.W. discussed the initial incidents of violence perpetrated by Wilson against her. She told of a time in January 2015, when she and Wilson were "play wrestling" and Wilson twisted her arm behind her back. J.W. went to the hospital and had to wear a sling for two weeks. J.W. also recalled, around that same time, that Wilson had put his forearm against her neck and the wall and pushed up, choking her.

J.W. explained that she did not go to the police about the abuse earlier because she was afraid of Wilson. J.W. also stated that Wilson had consistently told her that if she did not like what he was doing, she could leave. J.W. said she stayed because she loved Wilson, but she finally reported the abuse because she could no longer conceal it after the incident in front of her parents' home.

Wilson was arrested and charged, as a prior and persistent offender, with one count of robbery in the second degree (Count I); one count of property damage in the second degree (Count

III); one count of felonious restraint (Count IV); and twelve counts of domestic assault in the second degree (Counts II and V through XV).

At trial, J.W., the investigating officer, J.W.'s friend, and Wilson testified. A Facebook post, including comments on the post by Wilson and others, and letters wherein Wilson admitted to assaulting J.W. were admitted into evidence. Wilson denied ever assaulting J.W. or authoring the Facebook post or letters. The jury found Wilson guilty of attempted robbery in the second degree (Count I); two counts of domestic assault in the third degree (Counts II and XIV); property damage in the second degree (Count III); false imprisonment (Count IV); and eleven counts of domestic assault in the second degree (Counts V, VI, VII, VIII, IX, X, XI, XII, XIII, and XV).[3] Wilson was sentenced to fifteen years in the department of corrections for Counts I, VII, VIII, IX, X, XI, XII, and XV; ten years in the department of corrections for Count XIII; and 180 days in the Callaway County jail for Counts II, III, IV, V, and XIV, with all counts running concurrently except the sentence for Count XIII, which was ordered to run consecutive to the other sentences. Wilson appeals his convictions. Additional facts are provided throughout this opinion.

**Discussion**

Wilson raises two points on appeal. In his first point, Wilson alleges that the trial court abused its discretion in admitting the Facebook post and related comments because the State failed to lay a proper foundation. In his second point, Wilson asserts that the trial court erred in entering the judgment of conviction noting that four of the convictions in the written judgment differed from the jury's verdicts. We affirm Wilson's convictions but remand to the trial court for the limited purpose of correcting the written judgment to accurately reflect the jury's verdicts as to Counts I, II, IV, and XIV.

---

[3] The jury acquitted Wilson of Count VI, domestic assault in the second degree relating to the cigarette burn.

4

### *Point I – Foundation of the Facebook Post*

In Point I, Wilson alleges that the trial court erred in admitting screen shots of a Facebook post and associated comments purportedly written by Wilson, arguing that the State failed to lay a sufficient foundation to establish their authenticity and genuineness.

During J.W.'s testimony, the State moved for the admission of three photographs. These photographs consisted of screen shots of a post, and comments to the post, made to Wilson's Facebook account. J.W. explained that she was Facebook friends with Wilson and saw the post immediately after he posted it. She stated that she did not have the ability to log into Wilson's Facebook account, but she knew it was his because the profile photograph was Wilson with the couple's three children, and J.W. "talked regularly" with Wilson on Facebook Messenger. J.W. stated that as soon as she saw the post, she called her sister and a friend who captured the screen shots.

The Facebook post stated, "F*ck b*tches. Unloyal ass hoes all about themselves. Actin like victims. F*ck outta here c*nt." J.W. explained that several comments on the post were made by mutual friends and J.W. and Wilson's landlord. The comments included, "Ummmmm. You and [J.W.] having a bad day?" and, "Well damn Joseph I tease Nichole allot but that's just harsh!" Wilson then responded, "Naw bro. . . . this aint harsh. My bottle full. Im done protecting peoples image. Truth will come out. Only thing I done wrong was punch peeps in the face. And that makes me a monster. F*ck that. Tired of this bullsh*t." One of the commenters followed up, writing, "I thought this sh*t was about your old lady I was like f******ck." Wilson added, "Lol it is. She scared of me cuz she gets punched in face for her behavior. Already told her she can hit the door if she is unhappy. But she stays and continue disrespecting and exspects me to take it like im a b*tch. And as the world knows. . . I aint no b*tch."

Wilson's objection to the admission of the screen shots was overruled by the trial court.

*Standard of Review*

"The standard of review for the admission of evidence is abuse of discretion." *State v. Primm*, 347 S.W.3d 66, 70 (Mo. banc 2011) (citing *State v. Reed*, 282 S.W.3d 835, 837 (Mo. banc 2009)). "'This standard gives the trial court broad leeway in choosing to admit evidence; therefore, an exercise of this discretion will not be disturbed unless it is clearly against the logic of the circumstances.'" *Id.* (quoting *Reed*, 282 S.W.3d at 837). Our review is for prejudice, not error alone; and we "will reverse only if the error was so prejudicial it deprived the defendant of a fair trial." *State v. Hein*, 553 S.W.3d 893, 896 (Mo. App. E.D. 2018) (citing *State v. Naylor*, 510 S.W.3d 855, 862 (Mo. banc 2017)). "An error is prejudicial only if there is a reasonable probability that but for the court's error the outcome of the trial would have been different." *State v. Harris*, 358 S.W.3d 172, 174 (Mo. App. E.D. 2011) (citing *State v. McKinney*, 336 S.W.3d 499, 500 (Mo. App. E.D. 2011)).

*Analysis*

The same foundational requirements germane to the admission of writings apply to online messages. *See State v. Snow*, 437 S.W.3d 396, 402 n.4 (Mo. App. S.D. 2014) ("we believe the evidentiary foundation for a communication through Myspace should follow the rules for writings in general."); *cf. State v. Harris*, 358 S.W.3d 172, 175 (Mo. App. E.D. 2011) ("the content of text messages on a phone is more properly analogous to a personal letter and those rules of admissibility should be applied."). In order for a writing or document to be admitted into evidence, "'the proponent must lay the foundation for the document, including authenticity.'" *Hein*, 553 S.W.3d at 897 (quoting *State v. Hosier*, 454 S.W.3d 883, 899 (Mo. banc 2015)). "'The authenticity of a document cannot be assumed, but what it purports to be must be established by proof.'" *Id.*

6

(quoting *State v. Swigert*, 852 S.W.2d 158, 163 (Mo. App. W.D. 1993)). "Even if a document purports to have been written and signed by the person to whom it is attributed, that fact, standing alone, is insufficient to establish its authenticity and genuineness." *State v. Cravens*, 132 S.W.3d 919, 930 (Mo. App. S.D. 2004) (citation omitted). "Documents can be authenticated by circumstantial evidence." *Hein*, 553 S.W.3d at 897 (citing *Hosier*, 454 S.W.3d at 899).

*Snow* is the only Missouri case to address the foundational requirements pertinent to the admission of social media posts or messages. In that case, like here, the defendant complained that messages found on his social media page had not been adequately authenticated, arguing that the State failed to show that he "sent the message, or that he alone had access to his [Myspace] account." 437 S.W.3d at 402. The Court recounted the evidence supporting authenticity, including the following:

> Mother (1) testified she has a "Myspace page," and has seen Defendant's "Myspace page," (2) identified the message as "a Myspace message that was sent from" Defendant's "Myspace account to [Mother's] Myspace Account" slightly more than one month after Mother's son was injured, and (3) printed the messages and provided it to the prosecutor's office. Mother also testified (1) she had visited Defendant's Myspace page "where he identified that this is his Myspace page," (2) Mother and Defendant had allowed each other access to their Myspace pages, (3) Defendant's Myspace page could not be found unless searched for in a specific way, (4) Mother recognized the message as being from Defendant's Myspace account by Defendant's name and photograph in the message, and (5) Defendant's photograph in the message was the photograph Mother "had seen on [Defendant's] Myspace account." The body of the message also contains information about Mother's pregnancy and Defendant's relationship with and feelings for Mother that, at the time of the message when Mother was less than three months pregnant, were unlikely to have been known by many persons other than Defendant and Mother.

*Id*. at 403. The Court found that this constituted a sufficient foundation for the admission of the Myspace messages. *Id*.

The evidence in the instant case compels a similar conclusion. J.W. testified that she recognized the Facebook page as being Wilson's based on the name and profile picture, which was

7

a photograph of Wilson and the couple's three children. J.W. explained that she could not log on to Wilson's Facebook account, but was able to see it because they were friends on the platform. J.W. also stated that she "talked regularly" with Wilson on Facebook Messenger, the platform's mobile messaging program. J.W. noted that she saw the Facebook post "immediately after he posted it[,]" and that she was surprised that Wilson had posted publicly about the assault. J.W. further explained that the post and comments from Wilson used slurs[4] and contained grammatical errors[5] similar to those found in the letters Wilson had sent to J.W. Moreover, in response to comments to his post, Wilson clarified that he was referring to his "old lady" who he stated could "hit the door if she is unhappy[,]" – a specific theme that Wilson had used in previous communications to J.W. This evidence was sufficient to establish the authenticity and genuineness of the posts to Wilson's Facebook page captured by the screenshots contained in exhibits 8, 9, and 10, and the trial court's decision to admit those exhibits was not an abuse of discretion.

Further, even if we were to find the trial court had abused its discretion, which we do not, Wilson has failed to prove that he was sufficiently prejudiced by the admission of these exhibits to require reversal. *Hein*, 553 S.W.3d at 898 (citing *Naylor*, 510 S.W.3d at 862) (stating that an appellant "must show prejudice, however, to obtain appellate reversal"). As stated above, we "will reverse only if the error was so prejudicial it deprived the defendant of a fair trial." *Id*. at 896 (citing *Naylor*, 510 S.W.3d at 862). When reviewing for prejudice, "the issue is whether the evidence was 'outcome determinative,' that is, whether 'the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion

---

[4] Wilson referred to himself and J.W. as "b*ches," and he referred to J.W. as a "c*nt."

[5] Grammatical errors included using "cuz" instead of "because," and omitting the apostrophe in "I'm."

8

but for the erroneously admitted evidence.'" *State v. Driscoll*, 55 S.W.3d 350, 356 (Mo. banc 2001) (quoting *State v. Barriner*, 34 S.W.3d 139, 150 (Mo. banc 2000)).

Here, we would not find that the admission of the Facebook post was outcome determinative. In addition to the Facebook post in which Wilson admitted to punching J.W., letters written by Wilson were admitted into evidence and read aloud to the jury, in which Wilson admitted to assaulting J.W.:

> . . . But I cannot be doin that to my kids! That's abuse! to a T! And I won't leave our how you go through the same sh*t the kids do but sometimes I don't stop. I followed through! at first it was me being satisfied with yelling, then a shove felt ok, then knocking you down, then choking, or all the above if I wanted to mix sh*t up! then I was never satisfied. . . . I began punching you! Hitting you with a Coke can! Chasing you!

Wilson does not complain about the letters or related testimony in this appeal. "'Generally, prejudice does not exist when the objectionable evidence is merely cumulative of other evidence that was admitted without objection and that sufficiently establishes essentially the same facts.'" *State v. Elliott*. 271 S.W.3d 604, 607 (Mo. App. S.D. 2007) (quoting *State v. Smith*, 185 S.W.3d 747, 757 (Mo. App. S.D. 2006)).

We find that the trial court did not err in admitting the exhibits containing the screen shots from Wilson's Facebook post and, further, that Wilson has failed to prove he was prejudiced by the admission of those exhibits.

Point I denied.

### Point II – Erroneous Written Judgment

In his second point, Wilson asserts that the trial court erred in entering its written judgment, arguing that the following four convictions listed on the written judgment were erroneous: Count I, robbery in the second degree; Count II, domestic assault in the second degree; Count IV, felonious restraint; and Count XIV, domestic assault in the second degree. Wilson argues that the

9

correct convictions as found by the jury and pronounced orally by the trial court are instead: Count I, attempted robbery in the second degree; Count II, domestic assault in the third degree; Count IV, false imprisonment; and Count XIV, domestic assault in the third degree. The State concedes that the trial court's written judgment is erroneous, and we agree.

"Clerical errors in the sentence and judgment in a criminal case may be corrected by an order *nunc pro tunc* if the written judgment does not reflect what actually was done." *State v. Lemasters*, 456 S.W.3d 416, 426 (Mo. banc 2015) (citing *Soehlke v. Soehlke*, 398 S.W.3d 10, 22 (Mo. banc 2013)). "In a criminal case, Rule 29.12(c) allows the court to 'amend its records according to the truth, so that they should accurately express the history of the proceedings which actually occurred prior to the appeal.'" *Id*. (quoting *McGuire v. Kenoma, LLC*, 447 S.W.3d 659, 663 (Mo. banc 2014)).

Here, the written judgment does not accurately reflect what occurred at Wilson's trial and sentencing. The jury's verdicts and the trial court's oral pronouncement during both the trial and at sentencing clearly indicate that Wilson was convicted in Count I of attempted robbery in the second degree; in Count II of domestic assault in the third degree; in Count IV, false imprisonment; and in Count XIV, domestic assault in the third degree. The remainder of Wilson's convictions are correctly identified and the punishments set forth in the written judgment for all counts accurately track the trial court's oral pronouncement. Therefore, "this is a proper circumstance—indeed, the prototypical circumstance—for an order *nunc pro tunc* correcting the written judgment to reflect what actually occurred." *Lemaster*, 456 S.W.3d at 426.

Point II granted.

**Conclusion**

Wilson's convictions are affirmed. We, however, issue a limited remand with directions to the trial court to enter a *nunc pro tunc* order correcting the written judgment as to Counts I, II, IV, and XIV to conform to the jury's verdicts.

_____
EDWARD R. ARDINI, JR., JUDGE

All concur.