

# Missouri Court of Appeals
## Western District

| | |
|---|---|
| STATE OF MISSOURI, | ) |
| | ) WD85214 |
| Respondent, | ) |
| v. | ) OPINION FILED: |
| | ) |
| GRAYDEN LANE DENHAM, | ) March 12, 2024 |
| | ) |
| Appellant. | ) |
| | ) |

**Appeal from the Circuit Court of Platte County, Missouri
The Honorable James Walter Van Amburg, Judge**

**Before Division One: Alok Ahuja, Presiding Judge,
Cynthia L. Martin, Judge, and Thomas N. Chapman, Judge**

Grayden Denham appeals his convictions and sentences for four counts of first-degree murder, four counts of armed criminal action, one count of animal abuse, one count of second-degree arson, and one count of felony stealing. He raises five points on appeal: (1) the trial court erred in entering judgment of conviction and issuing a seven-year sentence for felony stealing for theft of a motor vehicle; (2) the evidence was insufficient to support his conviction for animal abuse; (3) the trial court plainly erred in failing to instruct the jury on a defense to the charge of animal abuse; (4) the trial court erred in memorializing the pronounced sentence in the written judgment; and (5) the trial

court abused its discretion in admitting into evidence ammunition found in the trunk of the car that he was driving. The State concedes points one and four. The judgment is reversed in part and affirmed in part, and the case is remanded with directions.

## Background

In February 2016, 24-year-old Denham lived with his grandparents, R.D. ("Victim Grandfather") and S.D. ("Victim Grandmother") (collectively "Victim Grandparents") south of Edgerton in rural Platte County. Denham's sister, H.A. ("Victim Sister"), and her three-month old son, M.S. ("Victim Nephew"), also lived with Victim Grandparents.

On February 7, 2016, the next-door neighbor ("Neighbor 1"), who lived about 300 yards to the west of Victim Grandparents' home, asked Denham why he wasn't inside watching the Superbowl with his grandfather. Denham said, "[T]hey don't have much longer to live." Around this time, a friend of Victim Grandparents was talking to them about "the change in [Denham]" and said that she was "a little bit leery of him." Victim Grandmother said that she was too. The friend then told Victim Grandparents to be very careful.

On February 18, 2016, Neighbor 1 was fixing his fence near Victim Grandparents' house when he heard Victim Grandfather asked Denham to take out the trash. Denham flipped Victim Grandfather off and went into the house.

Around noon on February 19, 2016, the mother of Denham's children, D.M., and their two children went to Victim Grandparents' house for a late exchange of Christmas gifts. During the five hours that D.M. and the children were there, Denham was acting

2

"very strange." He only interacted with D.M. and the children "[f]or a little bit." He stayed in the kitchen watching a movie while everyone exchanged gifts. He also sat in the rocking chair in the living room, staring at the wall deep in thought. When D.M. and the children were about to leave around 5 p.m., Denham asked D.M. if she would drive him to his mother's house, and she agreed. On the ride to his mother's house, Denham asked D.M to pull over in a cornfield and have sex with him. When D.M. refused, Denham "had an evil laugh" and stared at her with "a blank stare."

At 5:39 p.m. that same evening, Denham entered a St. Joseph Walmart. He was wearing a black T-shirt and very dark blue jeans with a design on the pocket. At 5:42 p.m., Denham walked past the gas cans in the store and a few seconds later returned to the gas cans. At 5:44 p.m., he carried three gas cans to the checkout counter and purchased them.

At approximately 6:48 p.m., Denham purchased 7.427 gallons of diesel fuel at Farris Truck Stop about 15 or 20 minutes south of St. Joseph in Faucett. When he prepaid for the diesel, he asked the cashier if the pump that he was at had a small nozzle, which was needed to fill a gas can, rather than a big nozzle that was used to fill semi-trucks. Two hours later, at 8:49 p.m., Denham purchased $15 of gasoline at Trex Mart in Trimble. He filled one of his gas cans with the gas that he purchased.

That night at 11:30 p.m., a neighbor ("Neighbor 2"), who lived about a quarter of a mile from Victim Grandparents, left work. When he approached his home approximately 10 minutes later, he noticed a "glow over the hedgerow" behind his house. Neighbor 2

3

drove to the south end of his property and saw that Victim Grandparents' house was on fire. He drove to Victim Grandparents' house, parked in their driveway, and called 911. Neighbor 2 then got out of his truck and started "hollering" for Victim Grandparents. He walked around the house yelling for Victim Grandparents. He could see into the house because "everything was lit up." The back part of the house was on fire. Some of the windows were broken and blackened, there was debris scattered across the yard, and there were multiple little fires towards one of the sheds. Neighbor 2 believed there had been an explosion.

A few minutes later, two other neighbors arrived, and the three neighbors walked around to the front yard yelling for Victim Grandparents. The three soon realized that the debris in the yard was actually the bodies of two adults, a baby, and a dog, later identified as Victim Grandmother, Victim Sister, Victim Nephew, and Victim Grandparents' dog. The bodies were located about 20 feet from the front porch, and were lined up head to toe. The bodies had been burned. Neighbor 2 then noticed Victim Grandfather's Ford Ranger near the shed. The driver's side door was open, and another body, later identified as Victim Grandfather, was on the ground near the driver's side door and was on fire.

When firefighters arrived at 11:52 p.m., the home was fully engulfed in flames. Although they had been dispatched to a possible explosion, they realized after the fire was extinguished that there had not been an explosion because walls of the house were intact on the foundation and there was no debris littering the yard. One firefighter thought the bodies in the front yard had been staged.

4

A Missouri State Fire Marshal's Office investigator, K.B. ("Fire Investigator"), arrived at the scene at around 4:30 a.m. By that time, the fires had been extinguished although there were still some hot spots and smoldering. Fire Investigator began an investigation. He was assisted by many people on the investigation, which lasted three days. Investigators found that the home was evenly and extensively burned throughout the whole structure. They removed debris from the basement of the house by heavy equipment. Investigators found a pistol, a rifle barrel, the barrel to an air rifle, and "copious amounts of ammunition" in the debris. They also found evidence of an ignitable liquid on the floor of the basement, which would have been there prior to the fire starting.

In a metal shed that was still standing on the property, Fire Investigator noticed a strong odor of gasoline and liquid on the floor and a chair consistent with an ignitable liquid being poured. Test results showed that the liquid was a combination of gasoline and a heavy petroleum distillate (diesel). A large pool of blood was also found on the shed floor as well as Victim Grandfather's wallet. Investigators also found .410 and .357 shell casings in a stocking cap in the shed and a spent .22 caliber shell casing in the support channels in the shed.

Fire Investigator also smelled a strong odor of gasoline in the Ford Ranger that was parked near the metal shed. The center console in the truck was wet with a liquid. A .22 caliber long rifle pistol and a revolver were found in the back seat of the Ranger. A Ford F-250 truck was parked next to the Ranger, and investigators found a gas can

5

between the two vehicles. Several rounds of ammunition, including 9 millimeter and .22 caliber cartridges were found in the F-250.

All of the human victims on the front lawn were positioned face up with their heads facing south. Fire Investigator testified that this was not the natural posture of a fire victim because "[i]f a fire victim is otherwise capable of moving and trying to get away, they do collapse, they're going to be moving forward trying to get away and they would be found, typically found face down." The ground below Victim Sister's body had two unburned areas, which showed that she was incapacitated at the time of the fire and did not attempt to escape.

All of the human victims suffered fourth degree burns, an extremely severe burn where the flesh and muscle completely split open and the bone is exposed. Clothing from each of the victims tested positive for a mixture of gasoline and a heavy petroleum distillate (diesel).

Victim Sister had two round patterns over her eyes that were undamaged by smoke or heat. Investigators found two pennies laying on the ground on each side of her head that matched the size of the round patterns on her eyes. Fire Investigator believed that the pennies were over her eyes at the time of the fire. He saw a similar pattern on all of the victims. A penny was still over Victim Nephew's right eye, and a penny that had been over his left eye had fallen to the ground. Two pennies were found by Victim Grandmother's head, and a penny was still on the right eye of Victim Grandfather with

another one on the ground near his head. In one of Denham's favorite movies the killers place pennies on the eyes of deceased victims after shooting them.

The dog victim was found lying on its right side above the head of Victim Sister. Fire Investigator saw evidence of a poured ignitable liquid on the dog with some areas of its body burned and some unburned. He also found two pennies near the dog.

Denham's mother's blue Mitsubishi Outlander was located on the property. In it, investigators found a Walmart receipt for three gas cans and a receipt from Farris Truck Stop for diesel fuel, both dated February 19, 2016. Denham's DNA was found in the Outlander.

Based on all of the evidence, Fire Investigator ultimately concluded that the fire was incendiary in nature, meaning that someone intentionally set the fire.

After the fire, Denham was missing along with Victim Grandparents' Nissan Versa. D.M. attempted to contact him, but he did not return her text and her phone call when straight to voicemail. On February 20, 2016, at around 9 p.m. Denham used his credit card at a gas station in Santa Rosa, New Mexico.

On February 21, 2016, at 7:36 a.m., Arizona Department of Public Safety Trooper K.J. received a dispatch that there was a naked male running through yards in Seligman, Arizona. The temperature was in the mid- to upper-twenties that morning, and the trooper found a disheveled man, later identified as Denham, standing in the middle of the street naked with a blanket wrapped around his shoulders and upper body. Denham told the trooper that he had hitchhiked with an unknown individual from Kansas to Arizona.

7

Denham gave the trooper his name but spelled it wrong. The trooper took Denham to the substation, got him some clothes, and called an ambulance. The ambulance then took Denham to the hospital in Flagstaff.

A few hours later, the Nissan Versa was found at the Stagecoach Inn in Seligman after a 911 call regarding a suspicious vehicle. The motel manager had found the car door open with a key in the ignition and clothing and a wallet on the ground outside of the car. The Versa had Oklahoma license plates, which were registered to a Hertz rental car. Law enforcement found Denham's identification in the wallet. They also discovered that the vehicle was associated with a homicide investigation in Missouri, and called the hospital security to make sure Denham did not leave.

A search of the vehicle recovered .22 caliber ammunition and .308 caliber rifle ammunition in a small, heavy bag in the trunk. Some of the .22 caliber rimfire cartridges had copper gilding on them, while others were "just plain lead." Some of the .22 caliber rimfire copper wash bullets were hollow point. A black shirt, a gold shirt, a hooded pullover, and a pair of jeans were found inside and on the ground near the car. The jeans tested positive for a heavy petrol distillate. The black shirt tested positive for gunshot residue. A bloodstain on the gold shirt matched Denham's DNA. His DNA was also found on the vehicle's steering wheel.

Jackson County Medical Examiner D.P. ("Medical Examiner") performed autopsies on all of the human victims and the dog victim. Each human victim was killed by gunshot wounds to the head, and they were burned after they died. Victim Sister was

first shot in the face with a shotgun and showed evidence of having breathed in blood. She was then shot twice in the wound and each bullet transected (cut in two) the brainstem. Medical Examiner recovered 14 bird-shot pellet and bullet fragments. Victim Nephew had four wounds caused by two bullets. He was shot once in the head and once in the right hand. Victim Grandmother had two wounds caused by one bullet that entered her head on the left side of her scalp and exited right in front of her right ear. Victim Grandfather had a single wound caused by a single bullet that entered on the inside of his left eye. The dog victim had a least four gunshot wounds that were located on the right side of his neck, his back, his chest, and on the right hindquarters area. The dog victim also had burn injuries.

A technician with the Missouri State Highway Patrol, E.G. ("Technician"), examined three firearms that were found on the victims' property: a .22 caliber Ruger pistol (found in the remains of house), a .22 caliber Beretta pistol (long rifle pistol found in the Ford Ranger), and a .22 caliber Chiappa revolver (found in the Ford Ranger). The Ruger had a lot of rust and was burnt. Bullet fragments recovered from Victim Sister and Victim Grandfather were indicative of .22 caliber rimfire hollow point bullets with copper gilding.

Denham was charged with four counts of first-degree murder (Counts I, III, V, VII), four counts of armed criminal action (Counts II, IV, VI, VIII), one count of animal abuse (Count IX), one count of second-degree arson (Count X), and one count of stealing (Count XI). In exchange for the State not pursuing the death penalty, Denham agreed not

to pursue a defense of not guilty by reason of mental disease or defect. The defense theory at trial was that Denham was suffering from serious mental health issues, did not deliberate, and was not guilty of first degree murder.

A jury found Denham guilty as charged. The trial court sentenced him to life imprisonment without the possibility of parole on each count of first-degree murder, 25 years' imprisonment for each count of armed criminal action, one year in jail for animal abuse, seven years' imprisonment for second-degree arson, and seven years' imprisonment for stealing. The trial court ordered that Counts I, II, III, IV, V, VI, VII, VIII, X, and XI were to run consecutively.

This appeal by Denham followed.

## Point One

In his first point on appeal, Denham contends that the trial court erred in entering judgment of conviction against him for felony stealing and sentencing him to seven years' imprisonment. He argues that at the time of the offense, the felony sentencing enhancement in section 570.030.3 applied only where the value of property or services was an element of the offense, and value was not an element of stealing a motor vehicle. The State concedes that the trial court plainly erred in convicting and sentencing Denham for felony stealing.[1]

---

[1] Denham made no objection to his conviction and sentence for felony stealing. "An unpreserved claim of error can only be reviewed for plain error[.]" *State v. Shockley*, 512 S.W.3d 90, 91 (Mo. App. E.D. 2017). "Plain error relief is appropriate where the alleged error so affects the rights of the defendant as to cause manifest injustice or miscarriage of justice." *Id.* "An unauthorized sentence affects substantial rights and results in manifest injustice." *Id.*

Section 570.030.1, RSMo Supp. 2014, provides, "A person commits the crime of stealing if he or she appropriates property or services of another with the purpose to deprive him or her thereof, either without his or her consent or by means of deceit or coercion."  Section 570.030.3 provides, in pertinent part, that "any offense in which the value of property or services is an element" is enhanced to a class C felony if "(3) [t]he property appropriated consists of…(a) [a]ny motor vehicle…or…(d) [a]ny firearms[.]"  § 570.030.3(3)(a) & (d).  Any violation of section 570.030 for which no other penalty is specified in the section is a class A misdemeanor.  § 570.030.9.

Denham was convicted of the class C felony stealing based on the allegation that he appropriated Victim Grandparent's 2012 Nissan Versa without their consent and with the purpose to deprive them thereof.

In *State v. Bazell*, 497 S.W.3d 263, 265 (Mo. banc 2016), the defendant was charged with, among other things, class C felony stealing for stealing firearms.  The Missouri Supreme Court stated that "the felony enhancement provision…only applies if the offense is one 'in which the value of the property or services is an element.'"  *Id.* at 266 (quoting § 570.030.3).  Because the defendant's firearms stealing convictions under section 570.030.3(3)(d) did not include the value of the firearms as an element of the

11

crimes, the Court reversed the firearms stealing convictions.[2]  *Id.* at 266-67; *State v.*

*Shockley*, 512 S.W.3d 90, 93 (Mo. App. E.D. 2017).

The State concedes that, under *Bazell*, the trial court plainly erred by convicting

and sentencing Denham for felony stealing.  We agree.  Denham's motor-vehicle stealing

conviction did not include the value of the motor vehicle as an element of the crime;

therefore, the offense was not subject to enhancement to a class C felony under section

570.030.3(3)(a).  *See Shockley*, 512 S.W.3d at 93 (where defendant's motor-vehicle

stealing conviction did not include the value of the motor vehicle as an element of the

crime, section 570.030.3 may not be used to enhance the conviction to a class C felony).

Denham's felony stealing conviction is reversed, and the case is remanded for entry of a

conviction of misdemeanor stealing and resentencing accordingly.

Point one is granted.

### Point Two

In point two, Denham contends that the evidence was insufficient to support his

conviction for animal abuse.  Appellate review of the sufficiency of the evidence to

support a criminal conviction is limited to determining whether any rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt.  *State v.*

*Jackson*, 636 S.W.3d 908, 924 (Mo. App. W.D. 2021).  The evidence and all reasonable

---

[2] "The revisions to the statute effective in January 2017 removed the language requiring value to be an element of the crime of stealing for the crime to be felony stealing."  *State v. Knox*, 604 S.W.3d 316, 320 n.5 (Mo. banc 2020) (citing § 570.030, RSMo 2016).

inferences in favor of conviction are accepted as true, and all contrary evidence and inferences are ignored. *Id.* The appellate court does not reweigh the evidence on appeal. *Id.*

A person is guilty of class A misdemeanor animal abuse if he "[i]ntentionally or purposely kills an animal in any manner not allowed by or expressly exempted from the provisions of sections 578.005 to 578.023 and 273.030." § 578.012.1(1), RSMo Cum. Supp. 2013. One exemption is found in section 578.007(7), RSMo 2000. The statute provides that section 578.012 shall not apply to "[t]he lawful, humane killing of an animal by an animal control officer, the operator of an animal shelter, a veterinarian, or law enforcement or health official[.]" § 578.007(7). "Humane killing" is defined as "the destruction of an animal accomplished by a method approved by the American Veterinary Medical Association's Panel on Euthanasia (JAVMA 173: 59-72, 1978); or more recent editions, but animals killed during the feeding of pet carnivores shall be considered humanely killed[.]" § 578.005(8), RSMo Cum. Supp. 2013.

Denham asserts that while the State presented evidence that he shot and killed the dog, the State failed to present sufficient evidence that he was guilty of animal abuse because shooting animals as a method of euthanasia is expressly permitted under the AVMA Reports.

"[T]he primary rule of statutory interpretation is to effectuate legislative intent through reference to the plain and ordinary meaning of the statutory language." *State v. Seymour*, 570 S.W.3d 638, 645 (Mo. App. W.D. 2019) (internal quotes and citations

13

omitted). "In ascertaining legislative intent[,] the entire act must be construed together and all provisions must be harmonized." *Id.* (internal quotes and citations omitted).

By its plain terms, the animal abuse statute, section 578.012, criminalizes intentionally or purposely killing an animal in any matter not permitted or exempted by specified statutes. *State v. Hill*, 996 S.W.2d 544, 547 (Mo. App. W.D. 1999). Section 578.007(7) provides that section 578.012 does not apply to the humane killing of an animal by an animal control officer, the operator of an animal shelter, a veterinarian, or law enforcement or health official. Under the plain meaning of section 578.007(7), a humane killing of an animal, as defined in section 578.005(8), must be carried out by "an animal control officer, the operator of an animal shelter, a veterinarian, or law enforcement or health official." § 578.007(7).

Denham relies exclusively on the definition of a "humane killing" in section 578.005(8), to argue that an issue existed whether his murder of the dog could constitute animal abuse. But the definition in section 578.005(8) does not itself allow or exempt the killing of animals from Chapter 578; it merely defines a term used in the chapter. Only section 578.007(7) actually exempts a "humane killing" from legal restrictions—but it does so only if the "humane killing" is performed by particular classes of persons.

Denham concedes that the State presented evidence that he shot and killed the dog victim. He presented no evidence at trial that he was an animal control officer, the operator of an animal shelter, a veterinarian, or law enforcement or health official, and

14

thus was not covered under the "humane killing" exemption. Sufficient evidence was presented to support Denham's conviction for animal abuse.

Point two is denied.

## Point Three

Denham's point three is related to point two. In point three, he contends that the trial court plainly erred in failing to instruct the jury on the "humane killing" defense to the charge of animal abuse.

Rule 28.03 prohibits a party from assigning error to the trial court's failure to give an instruction unless that party objects to the failure both during trial and in a motion for new trial. *State v. Robinson*, 484 S.W.3d 862, 869 (Mo. App. E.D. 2016). Denham correctly acknowledges that he did not preserve his claim of instructional error for review and requests plain error review. "Instructional error rarely constitutes plain error." *State v. Gannan*, 658 S.W.3d 103, 111 (Mo. App. W.D. 2022). To establish plain error from instructional error, a defendant "must show more than mere prejudice and must show that the trial court has so misdirected or failed to instruct the jury that it is apparent to the appellate court that the instructional error affected the jury's verdict, and caused manifest injustice or miscarriage of justice." *Id.* at 111-12 (internal quotes and citations omitted).

Rule 28.02(c) mandates the exclusive use of an MAI-CR instruction applicable under the law. "In general, a defendant is entitled to a jury instruction when substantial evidence and the reasonable inferences drawn therefrom support the theory propounded in the requested instruction." *State v. Hurst*, 663 S.W.3d 470, 474 (Mo. banc 2023)

15

(internal quotes and citation omitted). "In making this determination, a court must view the evidence in a light most favorable to the defendant." *Id.* (internal quotes and citation omitted). "Substantial evidence exists if there is evidence putting a matter in issue." *Id.* (internal quotes and citation omitted).

In this case, the jury was instructed, pursuant to MAI-CR 3d 332.62, to find Denham guilty of animal abuse if he "killed a dog" and he "did so purposely." The MAI-CR requires the submission of an optional third paragraph if any of the defenses in section 578.012.1 are supported by evidence. MAI-CR 3d 332.62 Notes on Use 3. The optional third paragraph provides:

> (Third, that the defendant did not kill the animal(s) [*List, in separate numbered paragraphs connected by "and" each and every circumstance in which killing the animal(s) may have been legal under Sections 578.005 to 578.023, RSMo, or Section 273.030, RSMo, and which is supported by any evidence in the case.*],)[.]

Denham argues that evidence was presented at trial supporting the humane killing defense because the AMVA Reports permit shooting animals as a method of euthanasia, therefore, a paragraph Third was required in the instruction. As discussed in point two, the humane killing exemption is set out in section 578.007(7) and provides that section 578.012 does not apply to the humane killing of an animal by "an animal control officer, the operator of an animal shelter, a veterinarian, or law enforcement or health official." Denham presented no evidence at trial that he was an animal control officer, the operator of an animal shelter, a veterinarian, or law enforcement or health official. The humane

16

killing defense was not supported by the evidence, therefore, the optional third paragraph of the instruction was not required. The trial court did not err, plainly or otherwise, in failing to instruct the jury on the defense.

Point three is denied.

**Point Four**

In point four, Denham contends that the trial court erred in memorializing the pronounced sentences in the written judgment because the written judgment did not conform to the oral pronouncement. The State concedes that the trial court plainly erred in memorializing the pronounced sentences in the written judgment.[3]

"[T]he written sentence and judgment of the trial court should reflect its oral pronouncement of sentence before the defendant." *State ex rel. Zinna v. Steele*, 301 S.W.3d 510, 514 (Mo. banc 2010) (internal quotes and citation omitted). "[I]f a material

---

[3] The State avers that Denham did not preserve this claim for review because he did not ask the trial court to correct the judgment and thus the claim can only be reviewed for plain error. We note that in some cases raising a similar claim of failure to memorialize the pronounced sentence, appellants seek plain error review because they did not raise the issue in the trial court. *State v. Pierce*, 678 S.W.3d 115, 124-25 (Mo. App. S.D. 2023); *State v. Clark*, 494 S.W.3d 8, 14 (Mo. App. E.D. 2016). Rule 29.12(b) provides, "Plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." "An unauthorized sentence affects substantial rights and results in manifest injustice." *Shockley*, 512 S.W.3d at 91. But in other cases, the issue is decided based on a court's authority to correct clerical mistakes under Rule 29.12(c) without addressing preservation. *State v. Davie*, 638 S.W.3d 514, 524 (Mo. App. W.D. 2021); *State v. Fewins*, 638 S.W.3d 36, 38-39 (Mo. App. S.D. 2021); *State v. Johnson*, 456 S.W.3d 497, 505 (Mo. App. E.D. 2015). Rule 29.12(c) provides, in pertinent part, "Clerical mistakes in judgments…arising from oversight or omission may be corrected by the court at any time after such notice, if any, as the court orders." Regardless, all of the noted cases review the issue consistently.

17

difference exists between the written judgment and oral pronouncement, the oral pronouncement controls." *Id.* (internal quotes and citation omitted). The failure to accurately memorialize the decision of the trial court as it was announced in open court is a clerical mistake. *State v. Davie*, 638 S.W.3d 514, 524 (Mo. App. W.D. 2021). "Clerical errors in the sentence and judgment in a criminal case may be corrected by order nunc pro tunc if the written judgment does not reflect what was actually done." *Id.* (quoting *State v. Knox*, 604 S.W.3d 316, 325 (Mo. banc 2020) and citing Rule 29.12(c)).

At sentencing, the trial court made the following oral pronouncement of Denham's sentences:

> On Count I, to the charge of the Class A felony of murder in the first degree, the defendant is sentenced to life in prison without the possibility of probation or parole. As to Count II, the charge of armed criminal action, the defendant is sentenced to 25 years in the Missouri Department of Corrections, and that sentence will be consecutive to the sentence in Count I. As to Count III, the Class A felony of murder in the first degree, the defendant is sentenced to life in prison without the possibility of parole. That sentence will be consecutive to the sentence in Count I. As to Count IV, the charge of armed criminal action, the defendant is sentenced to 25 years in the Missouri Department of Corrections, and that sentence will be consecutive to the sentence in Counts I, II and III. As to Count V, the Class A felony of murder in the first degree, the defendant is sentenced to life in prison without the possibility of parole. That sentence will be consecutive to all other sentences imposed today. As to Count VI, the charge of armed criminal action, the defendant is sentenced to 25 years in the Missouri Department of Corrections. That sentence is consecutive to the sentences in Counts I, II, III, IV and V. As to Count VII, to the charge of murder in the first degree, the defendant is sentenced to life in prison without the possibility of parole. That sentence will be consecutive to the sentences in I, II, III, IV, V and VI. As to Count VIII, to the charge of armed criminal action, the defendant is sentenced to 25 years in the Missouri Department of Corrections and that sentence will be also be consecutive to all prior charges. As to Count IX, which I believe is the charge of animal abuse, the

18

defendant is sentenced to one year in the Platte County jail and given credit for time served. As to Count X, to the Class C felony of arson, the defendant is sentenced to seven years in the Missouri Department of Corrections, and that sentence will be consecutive to the sentences in Counts I through IX. As to Count XI, the Class C felony of stealing, the defendant is sentenced to seven years in the Missouri Department of Corrections and that sentence is consecutive to the sentences in Counts I through X[.]

The trial court's written judgment materially differs from the court's oral pronouncement of Denham's sentences in several instances. First, in the section of the trial court's written judgment where each count is set out separately, the trial court indicates that each sentence for first-degree murder (Counts I, III, V, VII) is 999 years.[4] The authorized sentence for first-degree murder in this case is either death or imprisonment for life without the possibility of probation or parole. § 565.020.2, RSMo 2000. The sentences of 999 years' imprisonment in the written judgment are not authorized sentences under section 565.020 and materially differ from the orally pronounced sentences of life imprisonment without the possibility of parole. *See State v. Davis*, 179 S.W.3d 308, 309 (Mo. App. E.D. 2005) (sentence in written judgment for trafficking as a prior drug offender that did not reflect that it was to be served without probation or parole did not conform to oral pronouncement that properly indicated sentence would be served without probation or parole as required by statute).[5]

---

[4] The trial court correctly states in the paragraph at the end of the judgment that the sentences for Counts I, III, V, and VII are life in prison without the possibility of parole.

[5] *Cf. State v. Clark*, 494 S.W.3d 8, 14 (Mo. App. E.D. 2016) (sentences of "life (999) years" in written judgment materially different than sentences of life imprisonment orally pronounced because, among other reasons, they have different effect in determining parole eligibility).

Next, the trial court ordered in its written judgment that Counts I, II, III, IV, V, VI, VII, VIII, X, and XI are to run consecutively. Section 558.026.1, RSMo Cum. Supp. 2013, provides that "[m]ultiple sentences of imprisonment shall run concurrently unless the court specifies that they shall run consecutively[.]" Rule 29.09 reflects this principle:

> The court, when pronouncing sentence, shall state whether the sentence shall run consecutively to or concurrently with sentences on one or more offenses for which defendant has been previously sentenced. If the court fails to do so at the time of pronouncing the sentences, the respective sentences shall run concurrently.

"Rule 29.09 establishes a bright-line principle that when a sentencing court fails at the time of oral pronouncement to state whether a sentence is concurrent or consecutive, the mandatory language of the rule fills the gap and renders the sentence concurrent." *Zinna*, 301 S.W.3d at 514.

In its oral pronouncement, the trial court stated that Count III would run consecutively to Count I but remained silent as to whether Count III would run consecutively or concurrently to Count II. As such, Count III runs concurrently to Count II. § 558.026.1; Rule 29.09; *Zinna*, 301 S.W.3d at 516.

On Count IX, the trial court did not orally state whether that sentence would run consecutively or concurrently to the other sentences imposed. The trial court had previously stated that Count V would be "consecutive to all other sentences imposed today." It later ordered that Counts X and XI would run consecutively to all other previously imposed sentences. Therefore, the sentence for Count IX is concurrent to all

20

other sentences except the sentences for Counts V, X, and XI to which it runs consecutively. *Id.*

Because the written judgment does not conform to the trial court's oral pronouncement of sentence, it contains clerical errors that may be corrected nunc pro tunc. *Davie*, 638 S.W.3d at 524. The case is remanded to the trial court to enter a corrected judgment that conforms to the trial court's oral pronouncement of sentences.

## Point Five

In his fifth point on appeal, Denham contends that the trial court abused its discretion in admitting into evidence ammunition found in the trunk of the Nissan Versa in Arizona. He asserts that the unfair prejudice resulting from its admission far outweighed its nonexistent or minimal probative value.

A trial court has broad discretion to admit or exclude evidence in a criminal trial, and its decision will be reversed only if that discretion is clearly abused. *State v. Thomas*, 628 S.W.3d 686, 691 (Mo. App. E.D. 2021). "A trial court abuses its discretion when its decision is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." *Id.* An appellate court reviews the trial court's evidentiary ruling "for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *Id.* (internal quotes and citations omitted).

To be admissible, evidence must be logically and legally relevant. *State v. Prince*, 534 S.W.3d 813, 817 (Mo. banc 2017). "Evidence is logically relevant if it tends to make

the existence of a material fact more or less probable." *Id.* (internal quotes and citation omitted). "Legal relevance weighs the probative value of the evidence against its costs—unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness." *Id.* at 818 (internal quotes and citation omitted). If the prejudice of the logically relevant evidence outweighs its probative value, it is excluded. *Id.*

At trial, the State introduced into evidence, over Denham's objection, a small, heavy bag containing .22 and .308 caliber ammunition found in the trunk of the Nissan Versa, testimony about the ammunition, and photographs of the ammunition. Denham argues that the evidence was not logically relevant because there was no evidence connecting the ammunition in the car to the murders and no evidence that he owned the ammunition or that he knew the bag in the trunk of the car, which he did not own, contained ammunition. He further argues that even if .22 caliber ammunition was in the bag and .22 caliber ammunition was used in the murders, the corroborative value of the evidence was almost nothing because such ammunition is very common. Denham also argues that whatever minimal probative value the ammunition provided, it was far outweighed by the prejudice associated with the introduction of ammunition unrelated to the offenses. Denham relies on the general proposition that weapons and ammunition unconnected with the crime or the defendant are inadmissible because they lack probative value and are prejudicial. *State v. Hosier*, 454 S.W.3d 883, 895 (Mo. banc 2015).

Contrary to Denham's argument, the ammunition recovered from the Nissan Versa was logically and legally relevant. First, the evidence was directly related to the murders.

22

Some of the ammunition found in the small bag in the trunk of the vehicle were .22 caliber rimfire cartridges with copper gilding. Some of those were hollow point bullets. The same caliber bullets with copper gilding were found in at least two victims. Technician testified that bullet fragments recovered from Victim Sister and Victim Grandfather were indicative of .22 caliber rimfire hollow point bullets with copper gilding. The ammunition found in the vehicle was connected to Denham and the crimes. *See State v. Johnson*, 603 S.W.3d 371, 376 (Mo. App. E.D. 2020) (ammunition found in defendant's home and of the same caliber as the ammunition used in the shooting was connected to the defendant and the crime).

Additionally, the ammunition was related to the crimes because it was part of Denham's direct flight from the crime scene and tended to show a consciousness of guilt. "Evidence of flight is admissible to show consciousness of guilt." *Hosier*, 454 S.W.3d at 895. The methodology of the defendant's flight is probative as to the quality and depth of his consciousness of guilt. *Id.* The fact that Denham left Missouri after the murders with ammunition was probative of his guilt. *See id.* (fourteen guns and ammunition that were not alleged to have been used to commit the murder were logically relevant because they were found in defendant's car during his flight from Jefferson City directly after the murders).

Finally, any prejudicial effect the ammunition found in the Nissan may have had was eliminated by the evidence of numerous other weapons and ammunition introduced at trial. A pistol, a rifle barrel, and "copious amounts of ammunition" were found in the

23

remains of the house. A stocking cap with shell casings and a spent .22 caliber shell casing were found in the metal shed. A .22 caliber long rifle pistol and a .22 caliber revolver were found in the Ford Ranger, and more shell casings were found in the Ford F-250. Denham does not challenge the admission of any of this evidence on appeal. Any prejudicial effect of the ammunition found in the trunk of the Nissan did not outweigh its probative value in light of the other evidence of weapons and ammunition presented at trial. *See id.* at 896 ("numerous other weapons that were found in Defendant's apartment and storage shed were introduced at trial, eliminating any prejudicial value of the weapons from his car").

The evidence of ammunition found in the Nissan Versa was both logically and legally relevant. The trial court did not abuse its discretion in admitting it.

Even if the evidence was not admissible, which we do not find, reversal would not be warranted. As noted above, an appellate court reviews the trial court's evidentiary ruling "for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *Thomas*, 628 S.W.3d at 691 (internal quotes and citations omitted). "In a criminal trial involving improperly admitted evidence, the test for prejudice is whether the error was outcome-determinative." *Id.* (internal quotes and citation omitted). "A finding of outcome-determinative prejudice expresses a judicial conclusion that the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all evidence properly admitted, there is a reasonable probability that the jury would have acquitted but for the erroneously admitted

24

evidence." *State v. Thigpen*, 548 S.W.3d 302, 319 (Mo. App. E.D. 2017) (internal quotes and citation omitted). "Prejudice is not outcome-determinative when evidence of guilt is otherwise overwhelming." *State v. Duncan*, 397 S.W.3d 541, 544 (Mo. App. E.D. 2013).

Denham argues that while there was strong evidence that he committed the killings, there was not overwhelming evidence that they constituted first-degree murder. He asserts that the admission of the ammunition found in the Nissan unfairly bolstered the State's case regarding deliberation.

"The requirement of deliberation distinguishes first-degree murder from all other forms of homicide." *State v. Mills*, 623 S.W.3d 717, 724 (Mo. App. E.D. 2021). Deliberation is "cool reflection for any length of time no matter how brief[.]" § 565.002(3), RSMo 2000. "Deliberation can be inferred from evidence of planning." *Mills*, 623 S.W.3d at 725. It can also be inferred from the use of a deadly weapon on a vital part of the victim's body. *Id.* Multiple wounds and multiple victims support an inference of deliberation. *State v. Tisius*, 92 S.W.3d 751, 764 (Mo. banc 2002). "In addition, failure to seek medical help for a victim strengthens the inference that the defendant deliberated." *State v. Strong*, 142 S.W.3d 702, 717 (Mo. banc 2004). Finally, disposing of evidence and flight can support the inference of deliberation. *Tisius*, 92 S.W.3d at 764.

The evidence of Denham's deliberation and guilt of first-degree murder was overwhelming. Four human victims were killed by gunshot wounds to the head. Victim Sister was shot three times; Victim Nephew was shot twice. Medical help was not sought

for the victims; instead three of the human victims and the dog victim were staged in the front yard.  Pennies were also placed on the eyes of each victim, like in one of Denham's favorite movies.  Denham told a neighbor two weeks before the murders that the victims did not have much longer to live.  He purchased three gas cans and gasoline and diesel on the evening of the murders.  After the murders, Denham attempted to burn the victims and the buildings and vehicles on the property (in which three firearms were found) to conceal his role in the victims' deaths.  There were pour patterns in the yard, basement floor, unburned shed, and the Ranger, and both the metal shed and the Ford Ranger had a strong odor of gasoline.  Denham's jeans, which were recovered from the Nissan Versa, tested positive for a heavy petroleum distillate (diesel), and clothing from the victims and liquid from the metal shed also tested positive for a mixture of gasoline and a heavy petroleum distillate (diesel).  Denham then fled Missouri to Arizona in his grandparents' car.  He switched the license plates on the vehicle, and did not respond to D.M.'s messages after the murder.  Even without the evidence of the ammunition found in the Nissan in Arizona, the evidence of planning, the number of victims and their wounds, the disposal of evidence, and flight overwhelmingly supported Denham's deliberation and guilt of first-degree murder.

Point five is denied.

## Conclusion

Denham's conviction for felony stealing is reversed.  In all other respects, the judgment is affirmed.  The case is remanded to the trial court for entry of conviction for

26

misdemeanor stealing and sentencing on such conviction, and for entry of a corrected written judgment that conforms to the trial court's oral pronouncement at sentencing.

_____
Thomas N. Chapman, Judge

All concur.